UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ALEXANDRA CANOSA,

                       Plaintiff,

      -v-

DIRK ZIFF, TIM SARNOFF, TARAK BEN AMMAR,
LANCE MAEROV, RICHARD KOENIGSBERG,
JEFF SACKMAN, THE WEINSTEIN COMPANY
HOLDINGS, LLC, THE WEINSTEIN COMPANY,
LLC, HARVEY WEINSTEIN, ROBERT WEINSTEIN,
and DOES 1-10,

                       Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/28/19

18 Civ. 4115 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case is one of several pending in this District in which plaintiffs have brought claims

against the movie producer Harvey Weinstein ("Weinstein") and persons and entities affiliated

with him. These claims arise from alleged acts of rape, sexual abuse, intimidation, and

harassment. The plaintiff here, producer Alexandra Canosa, sues Weinstein; Weinstein's brother

Robert ("Robert Weinstein"); two companies run by Weinstein: The Weinstein Company

Holdings, LLC ("TWC Holdings") and The Weinstein Company, LLC ("TWC") (together, the

"TWC Companies"); and six former directors of these companies: Dirk Ziff, Tim Sarnoff, Tarak

Ben Ammar, Lance Maerov, Richard Koenigsberg, and Jeff Sackman (the "directors").[1]

---

[1] The caption of Canosa's Amended Complaint indicates that she also intends to bring claims
against persons she collectively identifies as "Does 1-10," but the Amended Complaint does not
contain any concrete allegations about these persons, including as to any actions taken by them
or the roles or positions that they occupied. The lack of any such allegations requires dismissal
of all claims against these defendants under Federal Rule of Civil Procedure 8. *Cf. Ferro v.
Railway Exp. Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961) (Rule 8 requires that a pleading
"give the defendant fair notice of what the plaintiff's claim is and the ground upon which it

Canosa alleges that, on multiple occasions, Weinstein raped, sexually abused, intimidated, and/or harassed her, under the guise of conducting business meetings and promoting her career. She claims that TWC and its employees facilitated and concealed this pattern of conduct; and that both Robert Weinstein, as a TWC principal, and TWC's Board of Directors turned a blind eye to Weinstein's predations to enable TWC to continue to profit from his fame and prestige. In all, Canosa brings 22 claims. These include federal claims under the Trafficking Victims Protection Act, 18 U.S.C. § 1591 ("TVPA"), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"); claims under New York common law and under the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and New York City Human Rights Law, N.Y. Admin. Code § 8-107 *et seq.* ("NYCHRL"); and under California law. With limited exceptions, the 22 claims are brought against all defendants.

Defendants, in separate motions, now move to dismiss most of Canosa's claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants some motions and denies others. The result of these rulings is that the Court sustains most claims against Harvey Weinstein; sustains the claims against the TWC Companies brought under the TVPA, NYSHRL, and NYCHRL but dismisses the other claims against them; and dismisses all claims against Robert Weinstein and the directors.

---

rests."). The Court accordingly does not address Does 1-10 further, save descriptively in addressing Canosa's RICO claims. *See infra* pp. 48–51.

## I.     Background

### A.     Facts[2]

#### 1.     Canosa's Interactions With Harvey Weinstein

Weinstein, a New York resident, is the former co-chairman of Miramax and, between 2005 and 2017 was an owner, director, and employee of both TWC companies. AC ¶¶ 17–18.

In 2010, Canosa began working with Weinstein and the TWC companies. Initially, Canosa met with Weinstein "because she wanted to pitch an idea for a production that she wished to produce with him," and thereafter worked with him "on various productions" and "in various capacities" as "either an employee or independent contractor." *Id.* ¶¶ 7, 32; *see also id.* at ¶ 51 (between September 2011 and March 2015, Canosa was a consultant for TWC).

Canosa alleges that, thereafter, from 2010 through September 2017, as chronicled below, Weinstein "constantly intimidated and threatened to ruin [Canosa's] career," *id.* ¶ 31, and engaged in numerous acts of sexual assault and related abuse, *id.* ¶¶ 32–54. Weinstein's practice was to meet with Canosa under the guise of working together on productions and to take advantage of the seclusion of those meetings and his power as a well-known producer to sexually assault and intimidate her. *Id.* ¶ 42. During these years Canosa lived in California and Weinstein flew her around the country and world to meet with him. *Id.* ¶ 34.

Canosa's specific allegations are as follows:

On August 12, 2010, Canosa met with Weinstein at the Tribeca Grand Hotel in New York City to discuss Weinstein's interest in an idea for an Eva Cassidy film that she had pitched and wished to produce with him. *Id.* ¶¶ 32, 35. Weinstein had flown Canosa to New York to make

---

[2] This account is drawn from the Amended Complaint. Dkt. 96 ("AC"). For the purpose of resolving the motion to dismiss, all factual allegations in the complaint are presumed true. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

this pitch. *Id.* ¶ 34. Weinstein showed interest in Canosa's idea and promised to make her part of the production team, assigning the Vice President of Production and Corporate Affairs at TWC to work with her on the project. *Id.* ¶ 35. During this meeting, Weinstein sexually assaulted Canosa. *Id.*

In September 2010, Weinstein flew Canosa to Toronto for the Toronto Film Festival. *See id.* ¶¶ 34, 36. On or about September 9–19, 2010, Weinstein sexually assaulted her at the Four Seasons Hotel. *Id.* ¶ 36.

In November 2011, Weinstein flew Canosa to New York ostensibly to discuss a television series that TWC was producing, Los Alamos, on which Canosa worked from June 2010 through September 2013. *Id.* ¶¶ 37, 49. On November 4, 2011, at his New York home, Weinstein sexually assaulted Canosa. *Id.*

From November 2011 to March 2012, Weinstein sexually assaulted, verbally assaulted, bullied, and intimidated Canosa multiple times at the Montage or Peninsula Hotels in Los Angeles. *Id.* ¶ 38.

On or about May 2, 2012, Weinstein assaulted Canosa at the Tribeca Grand Hotel in New York City. *Id.* ¶ 39.

On or about October 22, 2012, Weinstein sexually assaulted Canosa at the Peninsula Hotel in Los Angeles. *Id.* ¶ 40.

On or around December 20, 2012, in the Tribeca Grand Hotel in New York City, Weinstein intimidated Canosa into performing oral sex, and threatened and bullied her. *Id.* ¶ 41.

Between 2014 to 2017, Weinstein committed more assaults against Canosa, and threatened and intimidated her into keeping silent about the abuse. *See id.* ¶¶ 44–47.

From March 2014 until December 2015, Canosa worked for Marco Polo LLC, a television series affiliated with TWC, and on which Weinstein was acting as the executive producer. *See id.* ¶¶ 43, 50.

In May 2014, Canosa was in Malaysia working on producing Marco Polo. *Id.* ¶ 43. Weinstein had Canosa come to his hotel to discuss the production, and then raped and sexually assaulted her. *Id.*

In the week following December 2, 2014, Weinstein threatened and verbally abused Canosa in New York City. *Id.* ¶ 44. On or about December 21, 2014, Weinstein forced Canosa to perform a sex act in the Peninsula Hotel in Beverly Hills. *Id.* ¶ 45.

In June 2015, Canosa was in Hungary for work at Weinstein and TWC's request. *See id.* ¶ 46. On or about June 24, 2015, Weinstein physically assaulted and verbally abused Canosa in his room at the Four Seasons Hotel in Budapest. *Id.*

On August 29, 2017, Weinstein verbally threatened Canosa and told her not to speak with anyone about his abuse. *Id.* ¶ 47.

### 2. Allegations Relating to the TWC Companies

Canosa alleges that employees of the TWC Companies aided Weinstein in committing these sexual assaults. *Id.* ¶ 56. She claims that employees arranged for Weinstein to have use of the hotel rooms where the assaults took place, set up Weinstein's ostensible business meetings with Canosa despite knowing that assaults would likely occur, falsely assured Canosa that she would not be alone with Weinstein but then deserted her, gave Weinstein medications and other paraphernalia (such as caverject shots) that he needed to perform sexual acts, and cleaned up after the sexual assaults to avoid detection by others. *See id.* ¶¶ 57, 75.

Canosa alleges that, in similar fashion, Weinstein sexually assaulted and threatened numerous other women who worked for the TWC Companies and that there was a pervasive culture in the companies of facilitating this behavior. *See id.* ¶¶ 62, 68. TWC employees took steps to keep women from learning of Weinstein's sexual assault of others, with the result that Canosa believed that she alone had been a victim of such conduct and was afraid to come forward. *See id.* ¶ 75. To prevent other employees from discovering the assaults, the TWC Companies entered into several settlement agreements with other women containing strict non-disclosure provisions. *Id.* ¶¶ 89–90.

The TWC Companies also lacked a training program as to sexual harassment law and policy, an effective process for reporting and investigating complaints of sexual assault or harassment, and a meaningful or consistent process for documenting complaints of such conduct. *Id.* ¶ 91. When women complained to the companies' Human Resources personnel, such complaints were not kept anonymous from Weinstein, who retaliated against the complainants. *See id.* ¶¶ 65, 94.

### 3. Allegations Relating to Robert Weinstein

Between 2005 and 2017, Robert Weinstein was a director of the TWC Companies. *Id.* ¶ 19. With his brother, Robert Weinstein was co-chairman of Miramax, *id.* ¶¶ 1, 17, and co-owner, co-chairman, and co-CEO of the TWC Companies, *id.* ¶ 123.

Canosa alleges that Robert Weinstein knew of his brother's sexual assaults of various women while he and his brother jointly held positions at Miramax and TWC, *see, e.g., id.* ¶¶ 20, 112, 134, and that he did not investigate or take corrective action, *see id.* ¶¶ 116–17, 135. Canosa claims that Robert Weinstein used settlements with other women, which contained strict

non-disclosure agreements binding victims and witnesses, to prevent other TWC employees, the public, and law enforcement from learning of his brother's misconduct. *Id.* ¶¶ 118–19.

### 4. Allegations Relating to the Directors

Similarly, Canosa alleges that the directors were aware of Weinstein's misconduct towards women, *see id.* ¶¶ 140, 144, 165, 167, and did nothing to stop it, *see id.* ¶¶ 147, 152–56, 166, including declining to terminate Weinstein's employment, *see id.* ¶¶ 149–50. On the contrary, she alleges, the directors enabled such conduct through facilitating non-disclosure agreements pursuant to settlements with complaining women so that his conduct would not come to light. *See id.* ¶ 148.

### B. Procedural History

On December 20, 2017, Canosa initiated this action by filing a complaint in New York state court against the above defendants, plus three additional directors: Marc Lasry, Paul Tudor Jones, and James L. Dolan. Dkt. 1-1.[3]

On March 19, 2018, TWC Holdings and affiliates (including TWC) filed petitions for relief in United States Bankruptcy Court for the District of Delaware, *In re The Weinstein Company Holdings LLC, et al.*, No. 18-10601 (MFW) (Bankr. D. Del.). *See* Dkt. 1 ¶ 2 (Notice of Removal). Under Section 362(a) of the Bankruptcy Code, this filing automatically stayed all pending civil litigation as to the TWC Companies. The bankruptcy court later granted the motion of numerous defendants to lift the stay imposed on the TWC Companies. Dkt. 71-1 (September 10, 2018 bankruptcy court order).

---

[3] On June 6 and 8, 2018, respectively, Canosa stipulated to the dismissals of Lasry, Dkt. 31, and Dolan, Dkt. 36. Canosa does not name Jones as a defendant in the AC. The Court therefore dismisses any remaining claims against Jones as inadequately pled; even the state court complaint names Jones only in the caption and otherwise gives no indication of his role in or relevance to this proceeding. *See* Dkt.1-1.

On May 8, 2018, director Sarnoff—who on April 30, 2018 had filed a proof of claim in bankruptcy court for, *inter alia*, indemnification, contribution, and advancement, *id.* ¶ 3— removed Canosa's lawsuit to this Court on the basis of bankruptcy jurisdiction, *id.* ¶¶ 11–16.[4]

On May 21, 2018, the Court set a deadline of June 29, 2018 for the individual defendants to answer or otherwise respond. Dkt. 14. On June 4, 2018, the Court extended defendants' time to answer to July 10, 2018. Dkt. 28.

On June 7, 2018, Canosa moved to remand to state court. Dkt. 33. On June 21, 2018, Sarnoff submitted an opposition, Dkt. 41, which Ziff, Weinstein, Koenigsberg, and Robert Weinstein joined, *see* Dkts. 43, 44, 48, 49. On June 28, 2018, Canosa replied. Dkt. 53. The Court also again extended defendants' time to respond until after the Court resolved the motion to remand. Dkt. 52.

On July 25, 2018, the Court held argument on the motion to remand. *See* Dkt. 54. On August 1, 2018, the Court denied the motion, Dkt. 58, and set a briefing schedule for the directors' motions to dismiss, Dkt. 59. On September 12, 2018, after the automatic stay was lifted, the Court set a briefing schedule for the TWC Companies' motion to dismiss. Dkt. 75.

On September 12, 2018, defendants filed motions to dismiss. *See* Dkts. 78–91. On September 17, 2018, the Court issued an amend or oppose order. Dkt. 92. On October 4, 2018, Canosa filed the Amended Complaint. Dkt. 96 ("AC").

On October 25, 2018, most defendants moved to dismiss the AC.[5]

---

[4] Also on May 8, 2018, Sarnoff filed a statement of relatedness regarding another case in this District alleging sexual misconduct by Weinstein, 17 Civ. 9554 (AKH). Dkt. 3. On May 14, 2018, Judge Hellerstein declined the case as not related, and the case was assigned to this Court.

[5] Weinstein filed a letter stating his intent to rely on his previously-filed such motion, Dkt. 78, a declaration in support, Dkt. 79 ("Brooks Decl."), and a memorandum of law, Dkt. 80 ("H. Weinstein Mem."). *See* Dkt. 104. The TWC Companies filed a joint motion, Dkt. 106, and a

On November 8, 2018, Canosa filed an opposition.[6] On November 15, 2018, the moving

defendants replied.[7]

Pending alongside the motions to dismiss is a motion by Weinstein to stay this litigation

pending the completion of related criminal prosecutions of him.[8] The Court today issues an

order denying this motion subject to Weinstein's right to seek to stay discrete aspects of this

litigation (e.g., his deposition) that have potential to compromise his rights as a criminal

defendant.

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly

---

memorandum of law, Dkt. 107 ("TWC Mem."). Sarnoff and Ziff filed a joint motion, Dkt. 108, a declaration in support, Dkt. 109 ("Putnam Decl."), and a memorandum of law, Dkt. 110 ("Sarnoff Mem."). Robert Weinstein filed a motion, Dkt. 112, a declaration in support, Dkt. 114 ("Stein Decl."), and a memorandum of law, Dkt. 113 ("R. Weinstein Mem."). Maerov and Sackman filed a joint motion, Dkt. 116, a declaration in support, Dkt. 117 ("Aufhauser Decl."), and a memorandum of law, Dkt. 116 ("Maerov Mem."). Koenigsberg filed a motion, Dkt. 119, and a memorandum of law indicating his intent to join in, adopt, and incorporate by reference the arguments made in the Sarnoff and Maerov memoranda, Dkt. 120.

[6] This included a memorandum of law in opposition, Dkt. 130 ("Pl. Mem."), and a declaration in support, Dkt. 129 ("Hellman Decl.").

[7] *See* Dkt. 131 ("TWC Reply"), Dkt. 132 ("Sarnoff Reply"), Dkt. 133 ("R. Weinstein Reply"), Dkt. 134 ("Maerov Reply"), Dkt. 135 ("Koenigsberg Reply"). Weinstein did not file a reply.

[8] On October 27, 2018, Weinstein moved for such a stay. Dkt. 123. On November 1, 2018, the Court granted Canosa's consent motion for an extension of time to respond to that motion to stay until after briefing was complete on the motions to dismiss. Dkt. 128. On November 29, 2018, Canosa responded. Dkt. 138.

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

### A. Overview

Canosa, as noted, brings 22 claims. All—save the federal claims, based on TVPA and RICO—are brought against all defendants. In order, these are:

1. Battery
2. Assault
3. Intentional Infliction of Emotional Distress ("IIED")
4. Negligent Infliction of Emotional Distress ("NIED")
5. Negligent Supervision, Hiring, and Retention
6. Sexual Assault
7. Aiding and Abetting
8. NYSHRL (Sex Discrimination)
9. NYCHRL (Vicarious Liability)
10. Quid Pro Quo Harassment
11. Hostile Work Environment
12. Ratification
13. TVPA (against Weinstein)
14. TVPA (against TWC Companies)
15. TVPA (against Robert Weinstein)
16. Sexual Battery under Cal. Civ. Code § 1708.5
17. Gender Violence under Cal. Civ. Code § 52.4
18. False Imprisonment
19. NYSHRL & NYCHRL (Sex Discrimination)
20. NYSHRL & NYCHRL (Hostile Work Environment)
21. RICO (against Weinstein, the TWC Companies, Robert Weinstein, and Does 1–10)
22. RICO conspiracy (against Weinstein, the TWC Companies, Robert Weinstein, and Does 1-10)

To the extent Canosa's claims are brought against defendants other than Weinstein, in general she alleges that these parties, motivated by business gain, enabled Weinstein's sexual misconduct.

Canosa's claims are usefully sorted into three categories.

One set of claims, brought under New York common law, alleges intentional and negligent torts by Weinstein (claims 1–4, 6, and 18) for which other defendants are vicariously liable. Canosa's aiding and abetting (claim 7) and ratification (claim 18) claims are based on the same conduct, as are her two claims under California law for sexual battery (claim 16) and gender violence (claim 17).

A second set of claims, brought under New York common law and human rights statutes, allege workplace negligence and discrimination (claims 5, 8–11, and 19–20).

A third set of claims are Canosa's federal claims: under the TVPA (claims 13–15) and RICO (claims 21–22). Canosa's substantive RICO and RICO conspiracy claims allege the existence of a "Weinstein Sexual Enterprise," in connection with which various predicate crimes were committed.

Defendants challenge these claims as inadequately pled, untimely, or both.

The Court first considers Weinstein's arguments for dismissal, which run to a subset of claims. The Court then considers an argument made solely by the directors, to the effect that the claims against them constitute impermissible group pleading. The Court finally considers the remaining arguments by the TWC Companies, Robert Weinstein, and the directors. These take aim at all claims and significantly overlap.

Because most defendants ask to adopt one another's arguments where applicable, *see, e.g.*, H. Weinstein Mem. at 10; TWC Mem. at 1 n.1; Maerov Mem. at 1; *see also* R. Weinstein Mem. (relying on Sarnoff Mem.), where the Court finds a defendant's argument for dismissal

meritorious, it then considers whether this argument runs to other defendants' benefit. As to the directors, the Court treats the arguments made by one as applicable to all, because the AC does not factually differentiate among directors.

### B. Harvey Weinstein's Arguments for Dismissal

Weinstein moves to dismiss the AC's battery (claim 1), assault (claim 2), and IIED (claim 3) claims as time-barred; to dismiss the AC's NIED (claim 4) claim because the facts pled as to him make out intentional, not negligent, conduct; and the claims of negligent supervision (claim 5), aiding and abetting (claim 7), and ratification (claim 12) because they seek to hold Weinstein vicariously liable for his own intentional conduct. The Court addresses each argument in turn.

#### 1. Claims 1, 2, and 3 (Battery, Assault, IIED): Untimeliness

Weinstein moves to dismiss the AC's first three claims—all alleging intentional torts—as time-barred. H. Weinstein Mem. at 4. He notes that the incidents on which these claims are based occurred between 2010 and 2015, but that battery, assault, and IIED each have a one-year statute of limitations. *Id.* Because Canosa filed her initial action in state court on December 20, 2017, Weinstein argues that these claims are all time-barred. *Id.* Canosa counters that New York law extends the statute of limitations to five years for intentional torts associated with a sexual assault. Pl. Mem. at 14. For the reasons that follow, the Court holds that the five-year statute of limitations applies, such that Canosa's battery and assault claims arising out of incidents on or after December 20, 2012 are, as pled, timely. Further, the Court finds that, for the IIED claim, the continuing violation doctrine applies, such that all incidents pled are timely as to that claim.

Under New York law, intentional torts including assault, battery, and IIED are subject to a one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3) ("The following actions shall be

commenced within one year: . . . an action to recover damages for assault [and] battery.");
*Neufeld v. Neufeld*, 910 F. Supp. 977, 981 (S.D.N.Y. 1996) ("In New York, claims of intentional tort such as those alleging [IIED] are subject to a one-year limitations period."); *id.* (collecting cases). However, when such "physical, psychological or other injury or condition [is] suffered by a person as a result of acts" by someone who could be charged with criminal liability for rape, criminal sexual act, or aggravated sexual abuse, a civil claim "may be brought within five years." N.Y. C.P.L.R. § 213-c. New York criminal law defines rape in part as "sexual intercourse with another person . . . [b]y forcible compulsion," N.Y. Penal L. § 130.35, and criminal sexual act in the third degree in part as "oral sexual conduct . . . with another person without such person's consent," *id.* § 130.40.

Canosa alleges that Weinstein intimidated her into having oral sex on December 20, 2012, at a New York City hotel. AC ¶ 41. She further alleges that Weinstein raped her in Malaysia in May 2014, *id.* ¶ 43, and forced her into a sex act in a Beverly Hills hotel on December 21, 2014, *id.* ¶ 45. These allegations fall squarely within C.P.L.R. § 213-c. And each falls within the five-year statute of limitations; Canosa filed this action exactly five years after the alleged December 20, 2012 assault.[9] Accordingly, the battery and assault claims arising from these three incidents are timely. However, to the extent that Canosa's battery and assault claims arise from incidents before December 20, 2012—e.g., the August 2010 sexual assault in New York, the November 2011 sexual assault in New York, the assaults between November 2011 and

---

[9] "The day from which any specified period of time is reckoned shall be excluded in making the reckoning." N.Y. Gen. Constr. Law § 20.

March 2012 in Los Angeles, the May 2012 assault in New York, and the October 2012 assault in Los Angeles—these, unless saved by a tolling theory, are all time-barred.[10]

Canosa seeks to rescue the otherwise time-barred claims by invoking two doctrines that can achieve tolling: equitable estoppel and the continuing violation doctrine. Relevant to the former, she pleads that, "for as long as Harvey Weinstein was in power at [the TWC Companies] (until late 2017), [Canosa] was induced by fraud, misrepresentations or deception to refrain from filing any lawsuit, as she received numerous verbal threats to her career by Harvey Weinstein if she were to say anything to anyone about Harvey Weinstein's illicit conduct complained of herein if she did so." AC ¶ 70. Relevant to the latter, she pleads that her claims are all timely because "all of the acts committed by Harvey Weinstein . . . were interrelated, and a collective act, and were a continuous violation and abuse." *Id.* ¶ 74. Weinstein counters that, as pled, he neither made misrepresentations to Canosa nor lulled her in a way that tolls running of the statute of limitations under equitable estoppel, and that the continuing violation doctrine is inapplicable to Canosa's claims. *See* H. Weinstein Mem. at 6–8.

---

[10] The Court will, however, permit Canosa's claims to go forward as to the incident alleged in Toronto in September 2010. The parties dispute the statute-of-limitations law applicable to Weinstein's two alleged acts of battery and assault abroad, namely, the Toronto incident and the May 2014 incident in Malaysia. *Compare* Pl. Mem. at 15–18 (arguing that Ontario law applies to the Toronto events, and that New York law applies to the Malaysian events) *with* Sarnoff Reply at 2–3 (arguing that New York law should apply to all claims). As numerous courts in this District have recognized, "choice-of-law determinations are fact-intensive inquiries that would be premature to resolve at the motion-to-dismiss stage." *Bristol-Myers Squibb Co. v. Matrix Labs. Ltd.*, 655 Fed. App'x 9, 13 (2d Cir. 2016) (collecting cases). Such is the case here. New York's choice of law principles require context-specific "center of gravity" and "grouping of contacts," analyses that will likely be informed by the facts adduced in discovery. *Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011). Therefore, even though Canosa's claims as to the September 2010 incident in Toronto would be untimely under New York law, the Court will defer until after discovery any ruling as to whether the incidents abroad are time barred.

"To trigger the doctrine of equitable estoppel, a plaintiff must show that: (i) 'the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it'; and (ii) 'the plaintiff reasonably relied on that misrepresentation to [her] detriment.'" *Wall v. Constr. & Gen. Laborers' Union, Local 230*, 224 F.3d 168, 176 (2d Cir. 2000) (quoting *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995)). The AC does not plead that Weinstein ever made a misrepresentation of fact that caused Canosa to be unaware that she had a claim. As pled, Weinstein sought to intimidate Canosa from telling others about Weinstein's sexual abuses but this conduct did not entail misrepresentations of fact. That is decisive: The doctrine of equitable estoppel was "developed in the context of actions based on fraud." *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985). And while "[t]he doctrine has been applied in cases alleging causes of action other than fraud where the facts show that the defendant engaged in conduct, often itself fraudulent, that concealed from the plaintiff the existence of the cause of action," *id.*, the AC does not allege such fraudulent concealment. Reprehensible though acts of intimidation to achieve a victim's silence would be, they do not trigger this tolling doctrine.

As to the continuing violation doctrine, it applies to certain wrongs: "[I]n New York, '[d]espite the general principle that a cause of action accrues when the wrong is done, regardless of when it was discovered, certain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act.'" *Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir. 1980) (quoting N.Y. C.P.L.R. § 203 note (McKinney 1972) (McLaughlin, Practice Commentaries C203: 1)).

The AC's IIED claim is such a wrong. Where the course of conduct alleged involves sexual harassment, "New York courts have recognized that it is the continuous nature of the

conduct that may make it so outrageous and extreme as to be actionable." *Bonner v. Guccione*, 916 F. Supp. 271, 276–77 (S.D.N.Y. 1996). The *Bonner* court thus recognized that the actions alleged within the limitations period were not *examples* of "unpleasant treatment"; instead, the entire "course of harassing, intimidating, and demeaning conduct . . . the last event of which fell within the limitations period," *id.* at 278, was what constituted IIED. So too here: The AC's IIED claim alleges a course of intimidating and abusive conduct by Weinstein spanning August 2010 to August 2017. Canosa therefore may pursue her IIED claim with respect to all such incidents in that period. The continuing violation doctrine, however, does not apply to acts of assault and battery, which the law treats as distinct, non-continuous wrongs. *See, e.g.*, *Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 204 (E.D.N.Y. 1998) ("Causes of action for assault and battery accrue immediately upon the occurrence of the tortious act and thus, are not appropriate for the continuing violation exception."); *Abdullajeva v. Club Quarters, Inc.*, 1996 WL 497029, at *7 (S.D.N.Y. Sept. 3, 1996) ("[B]attery . . . [is a] tort[] in which the cause of action accrues for each wrong immediately upon the occurrence of the tortious act and thus [is] not appropriate for the continuing violation exception.").

The Court accordingly finds the AC's battery and assault claims timely as to acts from December 20, 2012 forward, but untimely as to earlier events, and finds the AC's IIED claim timely in its entirety.

### 2. Claim 4 (NIED): Failure to State a Claim

Weinstein next contends that because the AC alleges only intentional conduct on his part, the AC's claim for negligent infliction of emotional distress cannot survive. H. Weinstein Mem. at 8. Canosa does not appear to respond to this motion.

"Though litigants may allege alternate, or inconsistent, claims in a pleading, when the conduct alleged, if true, may only give rise to liability for an intentional act, a claim of negligence may be dismissed." *Bah v. City of New York*, No. 13 Civ. 6690 (PKC) (KNF), 2014 WL 1760063, at \*13 (S.D.N.Y. May 1, 2014); *see id.* (collecting cases); *see also United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 354–55 (2d Cir. 1993) (because battery claim entails intent to make contact, facts that supported it could not also support negligence). Here, the AC alleges only intentional conduct on Weinstein's part. It alleges that he intimidated, verbally abused, assaulted, and raped Canosa. Those allegations, if true, may give rise to liability only for intentional acts.

The Court accordingly grants Weinstein's motion to dismiss the AC's NIED claim. And, because this claim as brought against the other defendants is based on their ostensible vicarious liability for Weinstein's NIED, the dismissal of the claim against Weinstein requires dismissal of claim 4 as against all other defendants.

### 3. Claims 5, 7, and 12 (Vicarious Liability): Failure to State a Claim

Weinstein, finally, moves to dismiss the AC's negligent supervision, hiring, and retention (claim 5), aiding and abetting (claim 7),[11] and ratification (claim 12) claims against him, because these seek to hold Weinstein vicariously liable for his own intentional conduct. H. Weinstein Mem. at 9. Canosa again does not appear to respond.[12]

---

[11] Weinstein's brief identifies claim 6 rather than claim 7 in connection with his motion to dismiss the aiding and abetting claim against him, *see* H. Weinstein Mem. at 9, but because claim 6 in the AC alleges sexual assault, AC ¶ 267, whereas claim 7 alleges aiding and abetting, *id.* ¶ 285, the Court infers that Weinstein intended to move to dismiss claim 7.

[12] Canosa's brief defends her pursuit of claims against "[a]ll Defendants" under an aiding and abetting liability, Pl. Mem. at 18, but this discussion appears aimed at the defendants other than Weinstein, *see id.* ("[J]ust as these assaults were timely filed as to HW, they are timely filed as to any aider and abettor—the rest of the defendants herein.").

Weinstein is correct. These causes of action, as brought against Weinstein, seek to hold him vicariously liable for his own intentional conduct. That is not coherent. Weinstein cannot be held liable for negligently hiring, supervising and retaining himself; or for aiding and abetting or ratifying his own alleged intentional torts.[13] Accordingly, the Court grants Weinstein's motion to dismiss claims 5, 7, and 12 as against himself. This basis for dismissal is, however, particular to Weinstein. The Court later considers the other defendants' separate challenges to these claims.

### C. The Directors' Argument Regarding Group Pleading

The directors are named in all claims except those based on TVPA and RICO. Sarnoff and Ziff move to dismiss all claims against all directors (claims 1–12, 16–20) at the threshold, on the ground that these claims constitute impermissible group pleading. *See* Sarnoff Mem. at 4. They argue that because they are each individually mentioned in only one paragraph of the 551-paragraph AC, the AC does not satisfy Rule 8. *See id.* Canosa counters that this pleading is proper because the directors' liability turns on facts common to all directors, to wit, their inaction in the face of knowledge of Weinstein's abuses. Pl. Mem. at 25.

Rule 8 requires that a complaint give each individual defendant "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001) (citing *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir.

---

[13] Under the NYSHRL, there is a division of authority as to whether, under some circumstances, a person can be liable as an aider and abettor for their own discriminatory conduct. *Compare Raneri v. McCarey*, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) ("An individual cannot aid and abet his own alleged discriminatory conduct."), with *Johnson v. Cty. of Nassau*, 82 F. Supp. 3d 533, 536 (E.D.N.Y. 2015) ("[A] plaintiff may succeed in a claim under the NYSHRL by showing the employer entity's having encouraged, condoned, or approved the discriminatory conduct of a sole employee—the same discriminatory conduct which then, perhaps circularly, proves individual liability under the aiding and abetting provision . . . ." (quotation marks omitted)). Weinstein, in moving to dismiss claim 7, draws on this body of law. However, because the Court construes this claim as a common law claim, *see infra* p. 23, this body of law is irrelevant.

1961)); *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995)). When a complaint "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct," it fails to satisfy this minimum standard. *Id.*

That is not the case here. The AC does not deprive any director adequate notice of the basis for the claims against him. It does not allege personal involvement by any director in any assaults pled against Weinstein. Its theory instead is that the TWC Board of Directors was aware that such assaults were happening and failed to take action. The cases on which the directors rely are inapposite to such an allegation of collective inaction by a body in the face of unitary knowledge. In *Atuahene*, the plaintiff "alleg[ed] a host of constitutional and state common law claims [that] failed to differentiate among the defendants, alleging instead violations by 'the defendants.'" *Id.* It was impossible for each defendant to discern which facts were pleaded against him or her specifically. Similarly, in *Ochre LLC v. Rockwell Architecture Planning and Design, P.C.*, No. 12 Civ. 2837 (KBF), 2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012), *see* Sarnoff Mem. at 5,[14] the complaint failed to specify which defendants engaged in alleged infringing behavior, *Ochre*, 2012 WL 6082387, at *6. It instead collectively pled that "'defendants' gave an 'express understanding'" to the plaintiff, even though the plaintiff "would have had a course of dealing with particular individuals and could allege which of those individuals made improper representations." *Id.* The *Ochre* defendants were thus left to guess as to which of them were alleged to have made intentional misrepresentations to the plaintiff. In contrast here, the AC pleads collective knowledge by the directors of Weinstein's intentional wrongs towards women,

---

[14] Sarnoff and Ziff also cite this Court's decision in *Kalimanto GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 409 n.4 (S.D.N.Y. 2013), *see* Sarnoff Reply at 2, where the Court found a RICO claim inadequately pled because the alleged acts were isolated and sporadic and did not constitute long-term criminal conduct. *See id.* at 408–09. That is inapposite to the group pleading issue here.

followed by collective inaction. That pleading gives the directors adequate notice of the nature of the claims against them.

The Court therefore denies Sarnoff and Ziff's motion to dismiss all claims against the directors, to the extent the directors allege impermissible group pleading under Rule 8.

### D. Arguments By the TWC Companies, Robert Weinstein, and the Directors

#### 1. Claims 1–7, 12, and 18 (Common Law): Preclusion by New York Workers Compensation Law

Robert Weinstein and the TWC Companies move to dismiss the AC's common law claims against them as barred by the New York Workers' Compensation Law ("WCL"). R. Weinstein Mem. at 12; TWC Mem. at 4. They argue that the WCL is the exclusive remedy for work-related injuries, including those involving sexual assault alleged here. *See* R. Weinstein Mem. at 13–14; TWC Mem. at 5. Canosa responds that the WCL does not apply to her because she is as a California resident and because "intentional acts are not covered." Pl. Mem. at 25. The Court holds that it is premature to decide this issue on the pleadings, and therefore denies the motions on this point without prejudice to defendants' right to renew such motions later.

The WCL provides the exclusive remedy for negligence claims against an employer. *See* N.Y. Workers' Comp. Law § 29(6); *see also Stevens v. New York*, 691 F. Supp. 2d 392, 397 (S.D.N.Y. 2009). A threshold issue is whether the WCL covers Canosa. Defendants argue that Canosa was covered under the WCL to the extent that she was an employee of the TWC Companies, precluding her claims sounding in negligence. *See* R. Weinstein Mem. at 4; TWC Mem. at 12–13.

The AC is elusive on this point. It alleges that Canosa worked "for or with Harvey Weinstein, [and the TWC Companies] in various capacities since 2010, as either an employee and/or independent contractor." AC ¶ 7. It does not specify in which capacity or capacities she

worked at any particular time. The TWC Companies claim that to pursue her *statutory* claims under the NYSHRL, Canosa must have been an employee as opposed to an independent contractor. *See* TWC Mem. at 4.[15] They argue that the AC is fatally oblique with regard to during which time periods she occupied which role, apparently in an effort to keep alive both her common-law negligence claims (which the WCL would preclude were she an employee) and her NYSHRL claims (which would be unavailable were she an independent contractor). *See* AC ¶ 305 ("[A]t various points during the period complained of herein, [Canosa] was either seeking to have a business relationship with defendants, or was an employee and/or independent contractor of Defendants."). Robert Weinstein makes a different argument. He notes that "[a]n independent contractor can qualify as an employee for purposes of the WCL's exclusivity provision, and it is the plaintiff's burden to establish . . . that workers' compensation is unavailable to her." R. Weinstein Mem. at 13 n.11 (citation omitted). Robert Weinstein claims that Canosa has failed to meet this pleading burden and should be treated as an employee for purposes of the motions to dismiss.

　　As defendants note, the WCL may ultimately preclude common-law negligence claims of Canosa's. But any such finding would require a threshold determination that workers' compensation was available to her. The Court is persuaded that, prior to discovery, Canosa does not yet have the factual tools to make a confident showing that her work for Weinstein and TWC fell outside the WCL, so as to preserve her negligence claims. The AC pleads facts that make understandable Canosa's uncertainty as to the correct legal character of her work for Weinstein

---

[15] The NYCHRL is distinct. It provides that "natural persons employed as independent contractors to carry out work in furtherance of an employer's business enterprise who are not themselves employers shall be counted as persons in the employ of such employer." N.Y. Admin. Code § 8-102.

and TWC, *i.e.*, whether, at any given time, she was an employee or an independent contractor. The AC pleads that Canosa worked on a variety of projects and in a variety of contexts, including some as a consultant. Factual development is necessary before the Court can confidently find entitlement to workers' compensation so as to oust her negligence claims. Notably, the principal case on which defendants rely was decided after the close of discovery. *See Reed v. Paramount Wire Co.*, No. 04 Civ. 8059 (SAS), 2005 WL 1476455, at *2 & n.25 (S.D.N.Y. June 21, 2005) (holding, on summary judgment, that plaintiff had failed to establish he was uninsured during his employment, so as to retain eligibility to bring negligence claims).

The Court therefore denies the motion to dismiss on this ground. The denial is without prejudice to defendants' rights to argue, later in the litigation, that the WCL precludes Canosa's negligence claims.[16]

### 2. Intentional Tort Claims

#### a. Claims 1–3, 6–7, and 18 (Sexual Assault): Untimeliness

Sarnoff and Ziff move to dismiss as untimely the AC's intentional tort claims involving alleged sexual assaults (claims 1–3, 6–7, and 18) to the extent brought against them. They argue that the statute of limitations is extended to five years only as to a defendant who may be criminally charged with sexual assault, but that this extension does not apply to a civil claim against a defendant sued on a vicarious liability theory. Sarnoff Reply at 2–3. Canosa responds

---

[16] The Court defers resolution of Canosa's argument that the New York WCL does not apply to her, and hence cannot preclude her negligence claims because she is a California resident. *See* Pl. Mem. at 25. Defendants counter that Canosa's residence is irrelevant because (1) it is the employer's domicile, not the employee's, that is decisive under the WCL, *see* R. Weinstein Reply at 9–10 (citing N.Y. Workers' Comp. Law § 11), and (2) under California's Workers' Compensation Act, workers' compensation also provides the exclusive remedy for negligence claims of covered employees, *see* TWC Reply at 3 n.3 (citing *Schaffer v. GTE, Inc.*, 40 Fed. App'x 552 (9th Cir. 2002)). Pending a determination whether Canosa was an employee at all, it is premature to resolve this choice-of-law question (which the parties do not extensively brief).

that the non-Weinstein defendants are liable under an aiding and abetting theory and that her claims against them are governed by the same statute of limitations as her claims against the principal, Weinstein. Pl. Mem. at 18–19.

By its terms, C.P.L.R. § 213-c, which permits civil claims against a person who could be charged with criminal liability for rape, criminal sexual act, or aggravated sexual abuse to be brought within five years, applies only to "a civil claim or cause of action *to recover from a defendant*"; it defines such a defendant as "only a person who commits the act described in this section or who, in a criminal proceeding, could be charged with criminal liability for the commission of such acts." N.Y. C.P.L.R. § 213-c (emphasis added). The statute of limitations is therefore extended on the intentional assault claims (claims 1–3, and 6) only as to the claims against Weinstein, not against any other defendant. The AC's intentional tort claims, all of which as pled fall outside the statute of limitations period absent tolling, are time-barred as to the non-Weinstein defendants.

The analysis is slightly different for the AC's aiding and abetting claim (claim 7). Aiding and abetting is a separate cause of action from the underlying tort, with its own elements. *See Naughright v. Weiss*, 826 F. Supp. 2d 676, 691 (S.D.N.Y. 2011) ("New York specifically recognizes a cause of action for aiding and abetting an assault and battery." (quoting *Scollo v. Nunez*, 16 Misc. 3d 1118(A) (N.Y. Sup. Ct. 2007))).

"The statute of limitations for each aiding and abetting claim is determined by the underlying tort." *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 393 (S.D.N.Y. 2010). As applied to the TWC Companies and directors, the question is thus whether the statute of limitations for the "underlying tort" is the one-year period or the five-year period enabled by N.Y. C.P.L.R. § 213-c. Sarnoff and Ziff argue that Section 213-c extends the

statutory period only as to the "person who commits the act," and that an aider and abettor action fits within that Section's exclusion of "any related civil claim or cause of action arising from such acts." Sarnoff Mem. at 2–3 (quoting N.Y. C.P.L.R. § 213-c). Canosa argues for the opposite outcome, although her argument to this effect is essentially conclusory. Pl. Mem. at 18.

The Court holds, with defendants, that the aider and abettor cause of action is not timely as to the non-Weinstein defendants. The "underlying tort[s]" are properly read to mean those for battery, assault, IIED, and false imprisonment, which unambiguously have a one-year statute of limitations. The C.P.L.R. § 213-c extension is limited to the principal.

Accordingly, the Court grants defendants' motion to dismiss the AC's claims for battery, assault, IIED, and sexual assault (claims 1, 2, 3, and 6), and the accompanying aider and abettor claim (claim 7), against the non-Weinstein defendants. Although not explicitly discussed by defendants in their memorandum of law, the Court also dismisses the AC's false imprisonment claim (claim 18) against these same defendants because it is also an intentional tort subject to the same limitations.

> b.     *Claim 12 (Ratification): Failure to State a Claim*

Robert Weinstein, Sarnoff, Ziff, Maerov, and Sackman move to dismiss the AC's ratification claim (claim 12) against them because, as pled, they were not in a principal-agent relationship with Weinstein and he did not assault Canosa on their account. R. Weinstein Mem. at 11–12; Sarnoff Mem. at 27–29; Maerov Mem. at 18–19. The TWC Companies move to dismiss the AC's ratification claim against them because, they contend, it applies only to contract, not tort claims, and because, on the facts pled, the TWC Companies had insufficient knowledge of Weinstein's actions. TWC Mem. at 9–10. Canosa does not appear to respond to these arguments.

The Court is persuaded by defendants' arguments. Because the facts pled do not support that Weinstein, when assaulting Canosa, purported to act on behalf of TWC—but instead support that he acted for his own personal gratification—it dismisses the ratification claim as brought against all defendants.

In New York, "'[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" *Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007) (quoting Restatement (Second) of Agency § 82 (1958)). It applies to tortious conduct. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 n.12 (2d Cir. 2012) (discussing when ratification confers liability for the "underlying tortious conduct").

The AC does not plead any non-conclusory facts that make out that standard. It does not plead that, when Weinstein undertook his alleged tortious conduct against Canosa, he professed to be, or was, acting on behalf of TWC or its affiliates. Although the alleged assaults took place in the context of purported business meetings, the AC does not allege that TWC or its affiliates authorized him to assault Canosa on its account or that Weinstein ever so claimed. Nor do the facts pled inherently suggest that TWC or its affiliates benefitted from the sexual predations of their principal. Although Canosa pleads that TWC and its directors tolerated this behavior, and retained Weinstein so as to continue to benefit from his fame and prestige, she does not plead that his tortious conduct—consisting of crude sexual assaults—was done *on its account*. Thus, even if Weinstein was in a principal-agent relationship with certain defendants, and even if these defendants knew of his crimes, the AC has failed to state a claim of ratification.

Accordingly, the Court dismisses the AC's ratification claim against all defendants.

c.     *Claims 16 and 17 (California Codes): Failure to State a Claim*

The TWC Companies, Robert Weinstein, Sarnoff, Ziff, Maerov, and Sackman move to dismiss the AC's intentional tort claims under California law: to wit, her sexual battery claim (claim 16) under California Civil Code § 1708.5 and her gender violence (claim 17) under California Civil Code § 52.4. They argue that the AC inadequately pleads their vicarious liability. *See* TWC Mem. at 19; R. Weinstein Mem. at 21–22; Sarnoff Mem. at 29–30; Maerov Mem. at 20–21.[17] The Court assumes Canosa responds with the theories of aider and abettor and ratification liability outlined above. The Court agrees with these defendants that the AC fails to plead a viable theory of vicarious liability against them and dismisses the AC's sixteenth and seventeenth causes of action as against the TWC Companies, Robert Weinstein, and the directors.

An action under California Civil Code § 1708.5 for sexual battery requires intentional conduct. *See* Cal. Civ. Code § 1708.5(a). The AC alleges that the non-Weinstein defendants "are vicariously responsible for the [intentional] acts of Harvey Weinstein as alleged herein as they ratified and condoned same." AC ¶ 468. But, as explained above, the AC does not plead that Robert Weinstein, the directors, or the TWC Companies ratified Weinstein's sexual assaults. The AC has not alleged, other than conclusorily, that when he attacked Canosa, he was acting on anyone's behalf other himself.[18]

---

[17] Maerov and Sackman also argue that the AC's California claims against them are untimely. Because the Court holds that these do not state a claim, it does not address this argument.

[18] The AC includes several other factual allegations relating to the TWC Companies, but the acts described do not give rise to aider and abettor liability because they do not concern the assaults of Canosa. The AC alleges that TWC's Human Resources department failed to keep complaints made against Harvey Weinstein anonymous, allowing him to exact revenge, AC ¶ 65, and spoliated his personnel file, *id.* ¶ 55. The AC does not allege, however, that Canosa filed any internal complaint against Weinstein.

Under California Civil Code § 52.4, "[a]ny person who has been subjected to gender violence may bring a civil action for damages against any responsible party." Cal. Civ. Code § 52.4(a). However, § 52.4 states that it "does not establish any civil liability of a person because of his or her status as an employer, unless the employer *personally committed* an act of gender violence." *Id.* 52.4(e) (emphasis added). By definition, therefore, a "responsible party" does not include an "employer" who was not itself an active perpetrator of gender violence. Because the AC pleads, as to the non-Weinstein defendants, only that they are vicariously responsible as a result of their failure to act, it does not plead a claim for gender violence against them.

Accordingly, the Court dismisses Canosa's sexual battery and gender violence claims under California law as against the non-Weinstein defendants.

### 3. Negligence Claims

#### a. Claim 4 (NIED): Failure to State a Claim

In claim 4, alleging negligent infliction of emotional distress, the AC pleads only vicarious liability of Robert Weinstein, the TWC Companies, and directors. It does not plead that they themselves negligently caused her emotional distress. *See* AC ¶¶ 221, 224, 227 ("Harvey Weinstein's conduct negligently causes emotional distress to [Canosa] . . . [defendants] are vicariously liable for same. . . . [Defendants] are vicariously responsible for the acts of Harvey Weinstein as alleged herein . . . ."). Because the Court has dismissed the AC's NIED claim against Weinstein, *see supra* p. 17, it dismisses the vicarious claims against the non-Weinstein defendants.

b.    *Claim 5 (Negligent Supervision): Failure to State a Claim*

In claim 5, the AC claims negligent supervision and hiring. The TWC Companies,

Robert Weinstein, Sarnoff, Ziff, Maerov, and Sackman move to dismiss for failure to state a

claim. *See* TWC Mem. at 10; R. Weinstein Mem. at 8; Sarnoff Mem. at 13; Maerov Mem. at 8.

"To state a claim for negligent supervision or retention under New York law, in addition

to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the

defendant were in an employee-employer relationship; (2) that the employer knew or should

have known of the employee's propensity for the conduct which caused the injury prior to the

injury's occurrence; and (3) that the tort was committed on the employer's premises or with the

employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal

citations and quotation marks omitted).

The Court reviews these elements in turn. In the end, while the Court finds that the AC

adequately pleads the first two elements, it does not allege that any incident involving Canosa

took place on the TWC Companies' premises or with their chattels, requiring dismissal of this

claim.

                    i.    Employer-Employee Relationship

Robert Weinstein, Sarnoff, Ziff, Maerov, and Sackman, as directors of TWC, argue that

the AC does not adequately plead that they employed Weinstein. *See* R. Weinstein Mem. at 8;

Sarnoff Mem. at 14; Maerov Mem. at 8. Canosa does not appear to respond. These defendants

argue that, based on the pleadings, Weinstein was employed by the TWC Companies, not the

company's directors.

The Court is unprepared to dismiss this claim based on this element. On a motion to

dismiss, the bar for alleging an employer-employee relationship is not high. *See, e.g.*, *Haight v.*

*NYU Langone Med. Ctr., Inc.*, No. 13 Civ. 4993 (LGS), 2014 WL 2933190, *8 (S.D.N.Y. Jun. 27, 2014) (finding a negligent supervision claim adequately pled where "[t]he Complaint alleges that [the tortfeasing employee] was employed by Medtronic"). Further, while the AC alleges that Weinstein was employed by the TWC Companies, AC ¶ 233, it also alleges that Weinstein and TWC's directors "were in an employee-employer relationship," *id.* ¶ 238. There is no reason why Weinstein could not have been employed by both. In support of the latter claim, the AC pleads that "the majority of [the TWC Companies'] Board members supported renewing Weinstein's contract despite the serious assault allegations," *id.* ¶ 23. The AC has pled that the directors had some degree of control over Weinstein's employment contract. While the question is a close one, the Court finds adequate the AC's pleadings of employer-employee relationship between the directors and Weinstein.[19]

ii.    Employer Knowledge

The TWC Companies, Robert Weinstein, Sarnoff, Ziff, Maerov, and Sackman all argue that the AC fails to plead sufficient foreknowledge on their part of Weinstein's propensity for sexual assault to create liability for negligent supervision. *See* TWC Mem. at 11; R. Weinstein Mem. at 9; Sarnoff Mem. at 14; Maerov Mem. at 9. They argue the AC's allegations concerning

---

[19] Relying on a Third Circuit decision, Maerov and Sackman argue that a board of directors can *never* be liable as an employer in a negligent supervision claim. Maerov Mem. at 9 (citing *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 489 (3d Cir. 2013)). In *Belmont*, the Circuit held that "'in the absence of special circumstances it is the corporation, not its owner or officer, who is the principal or employer, and thus subject to vicarious liability for torts committed by its employees or agents.'" *Id.* at 489 (quoting *Meyer v. Holley*, 537 U.S. 280, 286 (2003)). That proposition logically follows in the context presented by *Belmont*, where the defendant was not alleged to have been an employer but merely an employee, *id.* at 490; the Circuit was reluctant to "plac[e] on directors the responsibility for day-to-day supervision of employees," *id.* Here, however, the alleged tortfeasor executive, Weinstein, was the corporation's lead executive (and indeed TWC bore his name). These logically qualify as "special circumstances," as it is reasonable to infer that the activities of such a figure were within the board's scope of review, so as to expose it, on properly pled facts, to claims of negligent supervision.

their knowledge of Weinstein's assaults and participation in non-disclosure agreements with women who claimed such assaults are conclusory and vague, unsupported by personal knowledge (Canosa does not claim to have reported the assaults on her), and pled generally without allegations keyed to any particular defendants.

On this element as well, the Court holds with Canosa. While the AC makes broad generalizations, viewed as a whole, it fairly alleges that Weinstein's assaults on women were pervasive and well-known, that the directors knew of multiple settlement agreements with women, and that they took no action in response to these "recurring issues." AC ¶ 140. For the directors to have foreknowledge of Weinstein's *propensity* for assault, they do not have to have been aware of particular assaults against *Canosa*. The AC adequately pleads that there were sufficient complaints within the company, some of which reached the directors, to give them foreknowledge of Weinstein's propensity for assault to support liability for negligent supervision of him.

### iii.    Employer Premises

The non-Weinstein defendants argue that the AC does not make out a claim for negligent supervision because, as pled, none of the alleged assaults on Canosa took place on TWC's premises or with its chattels, as required under *Ehrens*. *See* TWC Mem. at 11; R. Weinstein Mem. at 10; Sarnoff Mem. at 16; Maerov Mem. at 11. Instead, they note, as pled, these acts took place either in Weinstein's private homes or in hotel rooms. *See* AC ¶¶ 34–46.

On this element, the defendants are correct. Even assuming the hotel rooms in which the assaults on Canosa took place were paid for by TWC for use in connection with TWC projects, the third element of the tort of negligent supervision would not be satisfied. On this point, the Court finds apposite Judge Sweet's analysis in *Doe v. Alsaud*, 12 F. Supp. 3d 674 (S.D.N.Y.

2014). There, Judge Sweet held that a plaintiff had failed to state a claim for negligent supervision against a company for an assault committed by its employee in a hotel room. *Id.* at 684. The assault took place in the private hotel room of a Saudi Prince; the alleged tortfeasor employee was part of the Prince's entourage, and his specific duties included "ensuring that the 'climate' of the floor inhabited by the Prince at the Plaza Hotel was properly regulated." *Id.* at 676. Relative to Canosa, the plaintiff in *Doe* had made far more specific allegations as to the company's control over the hotel room, including "that the hotel was partially owned by the Prince's cousin," and that the employee even regulated the temperature on the floor. *See id.* at 684. Nevertheless, "[b]ecause the attack occurred there, not [the company's] premises," Judge Sweet held the plaintiff's negligent supervision claim inadequately pled. *Id.* Similarly here, all the alleged assaults by Weinstein of Canosa occurred outside of TWC's premises. Canosa does not cite any contrary authority. The AC, therefore, fails to adequately plead a negligent supervision claim.

The Court accordingly dismisses claim 5 against all defendants.

### 4. Claims 8–11 and 19–20 (Sex Discrimination): Failure to State a Claim

#### a. Overview: Narrowing These Claims to Two

Canosa brings a variety of sex discrimination claims, although the AC is less than pellucid as to the legal source of some of these claims. The AC explicitly bases claim 8 (sex discrimination) on the NYSHRL and claim 9 (employer liability for sexual assault) on the NYCHRL[20] and cites state and city administrative codes in the course of claims 19 (disparate

---

[20] Claim 9, although titled "VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAWS," names the New York City Civil Rights Law ("NYCRL") § 40-c in addition to the NYCHRL. AC ¶ 328. The AC cites the NYCRL only in the course of alleging that "[all defendants] have liability for the sexual assaults and other tortious conduct alleged herein against Harvey Weinstein by virtue of [NYCHRL] and [NYCRL]." *Id.* Defendants construe the AC's claims as

impact discrimination) and 20 (hostile work environment), which the Court construes to implicate the NYSHRL and NYCHRL (together, the "Human Rights Laws"). *See* AC ¶¶ 303–352, 496–511. The AC separately brings claims for quid pro quo harassment (claim 10) and hostile work environment (claim 11), but it does not identify the legal basis for these claims, and various defendants argue that these are not free-standing causes of action. TWC Mem. at 21; Sarnoff Mem. at 18; Maerov Mem. at 14. These defendants argue that these are instead *theories* of discrimination that may be pursued under the Human Rights Laws, and that the facts underlying them may support common law claims for assault and battery, but that there is no freestanding New York common-law claim for sex discrimination. Canosa does not appear to respond.

The Court begins by examining whether the AC's claims to this effect that are not anchored in the Human Rights Laws but that instead appear to be based on common law may survive. "It is not clear that sexual harassment . . . exists as an independent common law tort under New York law." *S.R. ex rel. M.R. v. Turnbull*, No. 12 Civ. 1052 (MEA), 2013 WL 1285411, at *2 n.2 (S.D.N.Y. Mar. 28, 2013). Canosa has not cited any case law supporting such a common law cause of action, and the Court has not found any. On the contrary, theories of sexual harassment, whether based on a quid pro quo or a hostile work environment theory, are

---

deriving from the NYSHRL and NYCHRL, and largely do not address the NYCRL provision at issue. *But see* Sarnoff Mem. at 19 n.22 (noting that sex discrimination claims under the NYCRL are analyzed identically to such claims under the NYSHRL and NYCHRL). NYCRL § 40-c, on its face, prohibits only sex discrimination, and does not provide any unique basis for liability. N.Y. Civ. Rights L. § 40-c. The Court therefore does not conduct a separate liability analysis pursuant to the NYCRL and discusses the AC's sex discrimination claims only in the context of the NYSHRL and NYCHRL. *Cf. Howe v. Town of Hempstead*, No. 04 Civ. 0646 (DRH) (ETB) 2006 WL 3095819, at *5 (E.D.N.Y. Oct. 30, 2006) (on summary judgment, finding that claims pursuant to "NYSHRL § 296; . . . and NYCRL § 40-c for employment discrimination all undergo essentially the same analysis, and will be considered together").

commonly brought either under federal law under Title VII (not pled here) or the Human Rights Laws. *See, e.g., Hill v. Children's Vill.*, 196 F. Supp. 2d 389, 393 (S.D.N.Y. 2002) ("Plaintiff proceeds on both *quid pro quo* and hostile work environment theories of sexual harassment").

Moreover, the six above claims are duplicative. Claims 8, 9, 10, and 19 plead theories of sex discrimination, including by means (claim 10) of quid pro quo harassment, and claims 11 and 20 plead a hostile work environment. Neither the NYSHRL nor the NYCHRL make statutory distinctions between these theories. Instead, the Human Rights Laws merely outlaw "[u]nlawful discriminatory practices" on the basis of, *inter alia*, sex. N.Y. Exec. L. § 296; N.Y.C. Code § 8-107. Sex discrimination includes sexual harassment through quid pro quo and hostile work environment theories. *See, e.g., Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminates on the basis of sex." (quotation marks omitted)).

Accordingly, the Court treats the AC as bringing one claim (claim 8) under the NYSHRL for discrimination, embracing Canosa's multiple theories of harassment, and another (claim 9) under the NYCHRL, again, embracing multiple theories of harassment. These claims are, as noted, brought against all defendants. The Court dismisses claims 10, 11, 18, and 19, as either based on non-existent common-law theories of liability or as duplicative, against all defendants.

b.      *Redressability*

Robert Weinstein moves to dismiss the AC's Human Rights Laws claims on the ground that their protections "general[ly]" extend only to those who live or work in New York, whereas Canosa, as pled, was a California resident at all relevant times." R. Weinstein Mem. at 15. Further, Robert Weinstein argues, because "most of Harvey Weinstein's assaultive and abusive behavior took place outside of New York," *id.*, these acts are outside the statutes' scope.

In so arguing, Robert Weinstein relies on *Hoffman v. Parade Publs.*, 15 N.Y.3d 285 (2010), in which the New York Court of Appeals noted the "disagreement among state and federal courts concerning the state and territorial reach of the City Human Rights Law in circumstances where the alleged discriminatory conduct is against a nonresident who does not work in New York City," *id.* at 290. The *Hoffman* court adopted an "impact" test for claims brought by nonresidents under the Human Rights Laws. This test requires that that the "impact" of the alleged discriminatory conduct have been felt within, respectively, the state or city. *See id.* 290–92. The plaintiff in *Hoffman* lived and worked in Georgia and brought his Human Rights Laws claims solely on the basis that the decision to terminate him had been made in his employer's NYC headquarters. *Id.* at 288. On that basis, dismissal was warranted under the impact test. *Id.* at 292.

The AC pleads far more here. It alleges that Canosa was assaulted and harassed by Weinstein numerous times in New York City during ostensible business meetings. It identifies five specific such instances between 2010 and 2014. *See* AC ¶¶ 35, 37, 39, 41, 44. The AC thus amply pleads both that Canosa worked for Weinstein in New York City and that Canosa, in New York City, felt the impact of his discriminatory and harassing conduct. The AC therefore pleads sufficient facts to invoke the protection of the Human Rights Laws.

      *c.*     *Timeliness*

Sarnoff, Ziff, and Robert Weinstein move to dismiss the AC's Human Rights Laws claims as time-barred. Sarnoff Mem. at 6; R. Weinstein Mem. at 15. Canosa responds by invoking the continuing violation doctrine.

Claims under the Human Rights Laws are subject to a three-year statute of limitations. *See* N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d). The last specific act that she

alleges took place in New York consisted of "threat[s] and verbal abuse[]" by Weinstein of her "in the week following December 2, 2014." AC ¶ 44. Canosa, however, filed her original Complaint on December 20, 2017, more than three years later. That act therefore falls outside the statutory limitation period.

Canosa argues, however, that because "the misconduct towards [her] was ongoing and pervasive, spanning years," under the continuing violation doctrine reviewed above, Weinstein's conduct should be treated as timely. Pl. Mem. at 19. The Court agrees. The AC pleads three additional acts of harassment that occurred within three years of the filing of this lawsuit. *See* AC ¶ 45 (December 21, 2014 Beverly Hills forced sex act); *id.* ¶ 46 (June 24, 2015 Hungary physical assault and verbal abuse); *id.* ¶ 47 (August 29, 2017 verbal threat; location unspecified). Although each act allegedly occurred elsewhere, the AC squarely pleads a pattern of discriminatory conduct that was felt by Canosa in, among other venues, New York City. A "continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Berrie v. Bd. of Educ.*, No. 14 Civ. 6416 (CS), 2017 WL 2374363, at *9 (S.D.N.Y. May 31, 2017) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)). The acts within the statutory period form part of such a continuing course of actionable conduct. And defendants do not cite case authority requiring, for the continuing violation theory to apply, an act *within New York* specifically in the three years preceding the Complaint.

Accordingly, the Court holds that claims 8 and 9, based on the NYSHRL and NYCHRL respectively, are timely brought, pursuant to the continuing violation doctrine.

Sarnoff, Ziff, and Robert Weinstein move to dismiss the AC's Human Rights Laws claims

on the ground that they are not liable as her employers because, as pled, they did not have control

over Canosa's employment. Sarnoff Mem. at 20; R. Weinstein Mem. at 15–17. Canosa responds

that the directors' alleged inaction in the face of chronic sexual misconduct by Weinstein, TWC's

principal, supports their liability as employers. Pl. Mem. at 24–25. For the following reasons,

the Court holds that the AC does not plead facts permitting either Robert Weinstein or the

directors[21] to be held liable under the Human Rights Laws, and accordingly dismisses claims 8

and 9 as against them. This ruling, however, leaves intact these claims against the TWC

Companies.

The Human Rights Laws permit individual liability for (1) employers, N.Y. Exec. L.

§ 296(1), (2) those who "actually participate[] in the conduct giving rise to [the] discrimination,"

*Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (quotation marks and citation omitted),

and (3) those who "aid, abet, incite, compel or coerce the [discrimination]," N.Y. Exec. L.

§ 296(6). The Court addresses these theories of liability in turn.

"State courts have held that '[g]enerally, four elements are considered in determining

whether the relationship of employer and employee exists [for purposes of the Human Rights

Laws]: (1) the selection and engagement of the servant; (2) the payment of salary or wages;

(3) the power of dismissal; and (4) the power of control of the servant's conduct.'" *Griffin v.

Sirva Inc.*, 835 F.3d 283, 291 (2d Cir. 2016) (quoting *State Div. of Human Rights v. GTE Corp.*,

487 N.Y.S.2d 234, 235 (4th Dep't 1985)). Crucially, the employer relationship must be alleged

---

[21] As noted, because Canosa's allegations against the various directors are virtually identical, such that the claims against the directors rise or fall together, the Court addresses these claims collectively rather than focusing specifically on the claims against Sarnoff and Ziff.

as to the aggrieved party (here, Canosa), not the alleged bad actor (here, Weinstein). *See* N.Y. Exec. L. 296(1).

Although the AC alleges that Robert Weinstein and the directors had some measure of control over *Weinstein's* employment contract, the AC has not so alleged with respect to their control over *Canosa's* employment. The AC, tellingly, does not allege that Robert Weinstein or the directors had any power whatsoever over Canosa's hiring or firing, her salary, or her work. These defendants are therefore not liable under an employer theory.

Nor does the AC permit Robert Weinstein or the directors to be held individually liable on an actual participation or an aider or abettor theory. The AC does not allege that Robert Weinstein or the directors actually participated in any conduct involving Canosa. Instead it repeatedly alleges that these parties "are liable because they were aware of and acquiesced in repeated and persistent unlawful conduct by *failing to investigate or stop it.*" AC ¶ 179 (emphasis added); *see also, e.g.*, *id.* ¶ 116 ("ROBERT WEINSTEIN was aware of the illicit activities committed by HARVEY WEINSTEIN complained of herein, and numerous other instances of similar conduct committed against other women, and failed to do anything about same or to investigate further."); *id.* ¶ 182 ("Defendants . . . failed to adequately investigate claims [by others of misconduct], take common-sense measures to protect female employees and third parties from HARVEY WEINSTEIN's illegal conduct, or terminate HARVEY WEINSTEIN's employment."). The AC further alleges that the TWC Companies entered into numerous non-disclosure agreements with other complaining employees but, as to this point, claims only awareness by Robert Weinstein and the directors of these agreements. *See id.* ¶ 183 (defendants were "fully aware of numerous settlements involving claims of misconduct"); *see also id.* ¶ 118 ("Robert Weinstein used settlements that contained strict Non-Disclosure

Agreements to keep law enforcement, the public, and even other [TWC] employees from discovering the extensive allegations of misconduct" but only "[TWC] itself entered into several of these Non-Disclosure agreements."). Although the inaction reflected in these allegations may be condemned as reprehensible, such inaction does not make out a claim of either active participation or anything amounting to "aid[ing], abet[ting], incit[ing], coerc[ing] or compel[ling]" Weinstein's alleged assaults on Canosa.

Canosa argues that because the directors' inaction in the face of Weinstein's assaults was, as alleged, in bad faith and animated by a desire to sustain TWC's profitability, the directors should nevertheless be held individually liable. Pl. Mem. at 24–25. But the one case on which Canosa relies as a basis to imply individual liability against corporate directors for "bad faith or fraud" does not arise under the Human Rights Laws, but addresses cases involving "breaches of contract or tortious acts committed by their corporations." *Rella v. N. Atl. Marine, Ltd.*, No. 02 Civ. 8573, 2004 WL 1418021, *9 (S.D.N.Y. Jun. 23, 2004). The Human Rights Laws contain their own statutory basis for liability, which governs here. It does not authorize liability based, without more, on a director's bad faith.

Accordingly, the Court holds that the AC does not state a claim under the Human Rights Law against Robert Weinstein or the directors. The Court therefore dismisses claims 8 and 9 against them.

e.    *Theories of Liability for Discrimination*

Finally, the TWC Companies argue that the AC does not adequately plead facts to support either a claim against them for sexual harassment under a quid pro quo theory,[22] or a claim for

---

[22] The TWC Companies also move to dismiss the AC's hostile work environment claim under the Human Rights Laws' statutes of limitation. *See* TWC Mem. at 23–24. Because the Court

disparate impact discrimination. At the outset, the Court notes that the Human Rights Laws do not have separate statutory categories for these theories of discrimination. They are "judicially created [terms] created for analytical purposes, not distinctions in the statute itself . . . ." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006). The AC is limited only by "the substance of alleged misconduct of which [Canosa] complains rather than the terms used to describe it." *Id.* Nevertheless, the Court addresses the TWC Companies' arguments challenging two theories of discrimination.

First, the TWC Companies argue that the facts pled in the AC do not support a claim for quid pro quo sexual harassment because Canosa did not suffer an adverse employment action, but instead had her career promoted as a result of Weinstein's predatory attentions. TWC Mem. at 22–23. The TWC Companies acknowledge that, as pled, Weinstein made threats against Canosa's career. But, because they claim the AC does not plead that Weinstein carried out these threats, they argue there cannot be a valid claim for quid pro quo harassment, but only one for a hostile work environment. *Id.* at 23 n.16.

The TWC Companies erroneously elide refusal and submission quid pro quo harassment cases. The "relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances." *Jin v. Met. Life Ins. Co.*, 310 F.3d 84, 96 (2d Cir. 2002) (quotation marks omitted). The Second Circuit in *Jin* extensively analyzed why the adverse employment action requirement applies only in retaliation cases where an employee has been punished for *refusing* to submit to a supervisor's sexual advances, not those that submit to them. *See id.* at 95–99. The *Jin* court refused to read quid pro quo harassment

_____

finds the AC's Human Rights Laws claims timely under the continuing violation doctrine, *see supra* pp. 34–35, the Court need not address this argument again here.

claims to require adverse action, noting that to do so would "punish the victims of sexual harassment who surrender to unwelcome sexual encounters." *Id.* at 99 (quotation marks omitted). The Circuit explained:

> It would be anomalous to find an employer liable when an employee was able to stand up to a supervisor's sexual demands, and therefore provoke an action such as termination, but to find no liability when the employee was unable to refuse and was actually subjected to sexual abuse. . . . [T]he employee who is coerced into satisfying a supervisor's sexual demands to keep her job may suffer a greater injury than the employee who is able to refuse those demands.

*Id.* (footnote and citation omitted). The AC pleads that Weinstein tied his sexual advances to meetings about Canosa's career and projects with the TWC Companies. *See, e.g.*, AC ¶¶ 37, 42–43, 46, 52, 54, 60. Additionally, it alleges that Weinstein threatened Canosa's career if she reported his predatory conduct. *See id.* ¶¶ 69–70, 72. The AC therefore states a claim for sexual harassment under a quid pro quo theory.[23]

Second, the TWC Companies argue that the AC, to the extent pursuing a theory of disparate impact discrimination, was required to identify a facially neutral policy, but that it fails to plead such. *See* TWC Mem. at 24–25.[24] The TWC Companies' argument appears to be that to

---

[23] In making this argument, the TWC Companies also misapply decisions on summary judgment as setting forth the governing pleading standard, and take liberties with their holdings. *See* TWC Mem. at 23 (citing *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253 (S.D.N.Y. 2011), for the proposition that "'unfulfilled threats' [are] insufficient to plead [a] quid pro quo claim" when the court in fact granted summary judgment against only plaintiff's NYSHRL quid pro quo claim and denied it as to his NYCHRL claim, *see id.* at 299–300)); *id.* (characterizing *Durant v. A.C.S. State & Local Sols., Inc.*, 460 F. Supp. 2d 492, 497 (S.D.N.Y. 2006), as "dismissing quid pro quo claims for failure to 'identify any tangible employment action'" when in fact the court granted summary judgment to defendant because of a lack of record evidence to support an adverse employment action, *see id.* at 497)).

[24] Although the AC lists "SEX DISCRIMINATION – DISPARATE IMPACT" as Claim 19, its allegation that "[d]efendants discriminated against plaintiff and other female employees on account of their sex in their hiring, promotion, training, treatment and termination during their employment," AC ¶ 498, may be better suited to a claim for sex discrimination by disparate treatment. As noted *supra* p. 38, Canosa may pursue either theory provided the AC pleads sufficient facts in support.

the extent TWC had a policy that disadvantaged women, such policy was blatant and so can only make out a hostile work environment claim, not a disparate impact claim. This argument fails.

"To prevail under the disparate impact theory of liability . . . a plaintiff [must] (1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 151 (2d Cir. 2012) (quotation marks and citations omitted). The AC alleges that not only were the TWC Companies aware of Weinstein's prolific predatory behavior against women, they lacked a meaningful process for reporting and investigating sexual misconduct, AC ¶ 91, had a policy of reporting complaints to Weinstein himself, *id.* ¶ 65, allowing him to retaliate, and entered into many non-disclosure agreements to conceal the behavior, *id.* ¶ 90. These policies disparately affected women as the only targets of Weinstein's predations.

The TWC Companies cite *Broomer v. Huntington Union Free School District*, Nos. 12 Civ. 574 (DRH) (AKT), 12 Civ. 575 (DRH) (AKT), 2013 WL 4094924 (E.D.N.Y. Aug. 13, 2013), in support. TWC Mem. at 25. But *Broomer* did not rely on the failure to plead a facially neutral policy to dismiss disparate impact claims; it found that the plaintiffs had failed to allege *any policy at all*. The *Broomer* plaintiffs had argued that a school district had a policy of requiring teachers to have a dual-language certification. The Court in dismissing, however, noted that "[t]here is no indication as to when such a policy was implemented or how such a policy could coexist with the fact that plaintiffs, who lacked dual-language certification, were recalled to teach other classes in the School District." *Id.* at *9. Additionally, the court found that the plaintiffs, non-Hispanic teachers, had not made any allegation of disproportionate effect of the alleged policy so as to impact them. *See id.* In contrast, the conduct alleged here in the AC amply pleads TWC policies that enabled Weinstein's predatory conduct. And it pleads facts

supporting that such policies disparately affected women, including Canosa. The AC therefore pleads a coherent theory of disparate impact sex discrimination.

The AC's claims Human Rights Laws claims therefore survive as against Weinstein and the TWC Companies.

### 5. Claims 13–15 (TVPA): Failure to State a Claim

The AC pleads three TVPA claims: against Weinstein (claim 13), the TWC Companies (claim 14), and "individual defendants," although that claim names only Robert Weinstein (claim 15). *See* AC ¶¶ 402, 419, 443. The TWC Companies move to dismiss the claims against them, TWC Mem. at 12–16, and Robert Weinstein moves to dismiss the claim against him, R. Weinstein Mem. at 19–21.[25] For the reasons that follow, the Court grants Robert Weinstein's motion to dismiss the TVPA claim against him but denies the TWC Companies' motion.

The TVPA creates a civil remedy by victims against perpetrators or those who benefitted financially from participation in a sex trafficking venture. *See* 18 U.S.C. § 1595. A TVPA participation claim must plead that the defendant "knowingly . . . benefits, financially or by receiving anything of value, from participation in a [sex trafficking venture,] while knowing . . . that means of force, threats of force, fraud [or] coercion . . . will be used to cause [a] person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2).

---

[25] Maerov and Sackman move to dismiss any TVPA claims against them, to the extent claim 15 may be read to implicate them as "individual defendants." Maerov Mem. at 19–20. The Court construes claim 15 as pled only against Robert Weinstein, the only defendant it names. To the extent claim 15 could be read to encompass unnamed others, the Court dismisses those claims for want of specific allegations against these others, and for the same reasons addressed as to Robert Weinstein.

### a.    Harvey Weinstein

Weinstein does not move to dismiss the TVPA claim against him except to the extent that arguments made by other defendants might run to his benefit. The other defendants' arguments do not successfully do so. The one argument made by others with potential to benefit Weinstein is that the TVPA was not intended to apply in contexts such as those pled by Canosa, *see* TWC Mem. at 12–13; R. Weinstein, but the Court rejects that argument, *see infra* pp. 44–45. Largely for the reasons persuasively given by Judge Sweet in another pending lawsuit against Weinstein, *see Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018), the Court finds that the TVPA applies to the AC's allegations against Weinstein, and that the AC states a TVPA claim. In particular, Canosa "has plausibly alleged that Harvey Weinstein, knowingly and in interstate commerce, enticed and or recruited her knowing that means of force, fraud, or a combination of the two, would be employed to cause her to engage in a commercial sex act." *See id.* at 523.[26]

The Court therefore sustains the TVPA claim (claim 13) against Weinstein.

### b.    TWC Companies

The AC pleads sufficient facts that the TWC Companies actively participated in the recruitment and enticement of women, knowing that those women would—or would likely—be coerced by Weinstein into engaging in what amounted to a commercial sex act with him. The AC alleges that the TWC Companies maintained women on their payroll whose responsibilities including introducing Weinstein to young women and covering up his assaults. *See* AC ¶¶ 430–

---

[26] The Court adopts herein Judge Sweet's construction of the statutory term "commercial sex act," and his finding, on similarly pled facts, that the plaintiff's "reasonable expectation of receiving [something of value] in the future, based on Harvey's repeated representations that she would," was sufficient to satisfy it. *Noble*, 335 F. Supp. at 521. The AC's allegations that Canosa expected to and in fact received career advances in exchange for participating in coerced sexual activity with Harvey Weinstein, *see, e.g.*, AC ¶¶ 35, 42, 54, 69, easily clear that bar.

434. The AC further alleges that although the TWC Companies knew that Weinstein's recurrent practice—indeed, pattern—was to lure women like Canosa into pretextual meetings and then subject them to forced sexual acts, the companies nevertheless continued to pay for and facilitate Weinstein's interstate and foreign travel, on which trips some assaults, including of Canosa, occurred. *See id.* ¶¶ 422–425. The AC also alleges that employees of the TWC Companies gave Weinstein the medications he required to perform sexual acts and cleaned up after his sexual assaults. *See id.* ¶ 57. The AC further claims that the TWC Companies "expressly or tacitly linked tangible job benefits to the commission of the forced sexual advances and sexual assaults aforesaid." *See id.* ¶ 356; *see also id.* ¶ 388.

In arguing that their alleged concrete support for Weinstein's sexual assaults does not state a claim against them under the TVPA, the TWC Companies first argue that "[t]he scenario raised in the Complaint is not akin to the perils of human sex trafficking the statute meant to address." TWC Mem. at 12. They ask the Court to distinguish between "bona fide" human trafficking cases, such as a reported incident in which a 15-year-old was given crack cocaine and lived with her abuser, with the corporate context of the instant case, in which Canosa "sought production work around the world, routinely traveled to TWC's offices in New York from her home in California, and chose to remain a TWC employee." *See id.* at 12–13.

The TWC Companies' attempt to cabin the TVPA to reach only caricatures of child slavery, and to exclude corporate-supported conduct, is wholly unpersuasive. The text of the TVPA does not provide any charter for this self-serving distinction. That the TWC Companies, as alleged, enticed Canosa to meet with Weinstein through the promise of production deals rather than the promise of crack, does not remove their conduct from the ambit of the statute. Nor does

the fact that, as alleged, the companies enabled Weinstein to force sexual acts on Canosa in expensive hotels rather than brothels.

In construing the TVPA to reach conduct such as Weinstein's, this Court, as indicated above, finds persuasive Judge Sweet's construction of the statute in *Noble*, involving claims of similar conduct by Weinstein. Judge Sweet held that Section 1595, the remedial provision at issue, "requires broad interpretation." *Noble*, 335 F. Supp. 3d at 515 (citing *Peyton v. Rowe*, 391 U.S. 54, 65 (1968) (recognizing "canon of construction that remedial statutes should be liberally construed")). As he noted, Sections 1591 and 1595 use "[b]road, expansive language," and "Congress's use of the word 'whoever' and its repeated use of the word 'any' 'does not lend itself to restrictive interpretation.'" *Id.* at 516 (quoting *United States v. Jungers*, 702 F.3d 1066, 1070 (8th Cir. 2013)). Judge Sweet found Weinstein's attempt to cabin Section 1591 to "child prostitution, torture, and child pornography" unpersuasive, and indeed, collected cases arising in less sensational contexts in which the TVPA has been applied to "defendants who have lured women, under false pretenses and with lucrative promises, for sexual purposes." *See id.* at 516 n.5. The conduct alleged by Canosa therefore comfortably falls within the scope of the TVPA.

The TWC Companies next argue that, even if the TVPA applies to Weinstein's conduct, the AC does not adequately allege that *they* participated in his sex trafficking venture. *See* TWC Mem. at 14. They rely on an unreported Sixth Circuit case that held Section 1591(a)(2) to require proof "that the defendant actually participated in a sex-trafficking venture," *see id.* (citing *United States v. Afyare*, 632 F. App'x 272, 282 (6th Cir. 2016)), and on Judge Sweet's dismissal in *Noble* of the TVPA claims brought against Robert Weinstein. Canosa responds that the AC here pleads concrete steps by the TWC Companies to aid and abet Weinstein's TVPA violations

that exceed substantially the allegations regarding Robert Weinstein's conduct in *Noble*. *See* Pl. Mem. at 12.

Canosa is correct. In *Noble*, Judge Sweet held that allegations that Robert Weinstein paid for Weinstein's travel and paid for prior settlements of claims made by women against him were inadequate to demonstrate his *participation* in a sex trafficking venture. *See Noble*, 335 F. Supp. 3d at 524. He stated that "'mere *membership*'" in a venture is "insufficient if [the defendant] is ignorant of the venture's sex trafficking activities (and the means and methods thereof).'" *Id.* (quoting *Afyare*, 632 F. App'x at 285). And, he noted, Section 1591(a)(2) "does not target [those] who turn a blind eye to the source of their financial sponsorship." *Id.* (quoting *Afyare*, 632 F. App'x at 286). The complaint at issue, Judge Sweet noted, did not allege that Robert Weinstein was "'present for any of the alleged assaults,'" "'was told about them before or after they occurred,'" or "'anything similar, which might show knowledge or reckless disregard.'" *Id.* (quoting *Lawson v. Rubin*, 17 Civ. 6404 (BMC), 2018 WL 2012869, at *11 (E.D.N.Y. Apr. 29, 2018)). Judge Sweet therefore held that there were no "specific factual allegations that plausibly allege Robert knew of, or participated in, Harvey's alleged violation of Section 1591." *Id.*

Here, in contrast, as to the TWC Companies, the AC alleges specific means and methods used by multiple company employees to facilitate Weinstein's sexual assaults and to cover them up afterwards. It alleges a series of assaults during a five-year period facilitated by the TWC Companies. And it alleges that the TWC Companies entered into non-disclosure agreements with many women, with the predictable effect of enabling future assaults by Weinstein. These allegations easily exceed those made against Robert Weinstein in *Noble*. The pattern of facilitation and cover-up by these companies is sufficiently developed here to state a claim of participation against the TWC Companies under Section 1591(a)(2).

The TWC Companies finally argue that they did not knowingly benefit from any alleged participation in a sex trafficking scheme. TWC Mem. at 15. Citing an unreported decision from the Western District of Arkansas, these defendants argue that the AC must allege a "causal relationship between the sex act" and the benefit purportedly received by the defendant. *Id.* (quoting *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10 Civ. 4124, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24. 2013)). They claim that the AC's allegation that TWC financially benefited from Weinstein's promotion of TWC and profited from its projects are inadequate. *Id.*

In so arguing, however, the TWC Companies elide a central allegation of the AC: that by facilitating and covering up Weinstein's sexual assaults, TWC made Weinstein more likely to continue to work for TWC. While the facts developed in discovery may or may not substantiate this allegation, the AC adequately pleads a symbiotic relationship between the TWC Companies and Weinstein, in which the companies affirmatively enabled and concealed Weinstein's predations as a means of keeping him happy, productive, and employable which led the companies to achieve fame and reap financial benefits. *See, e.g.*, AC ¶ 447 ("[Weinstein] was the face of [the TWC Companies] and his presence and promotion . . . brought exposure and prestige to [their] films."). The TWC Companies' claim that there is no causal link between their acts and practices and Weinstein's sexual abuse of women, including Canosa, is thus unpersuasive.

The AC therefore pleads sufficient facts to sustain a Section 1591(b) TVPA participation claim against the TWC Companies.

### c.    *Robert Weinstein*

Robert Weinstein argues that the AC's TVPA claim against him should be dismissed largely for the reasons Judge Sweet articulated in dismissing claims against him *Noble*. *See* R. Weinstein Mem. at 19–20. He is correct. The AC does not plead a TVPA claim against Robert Weinstein with adequate specificity. In contrast to its allegations regarding the TWC Companies, the AC pleads only conclusory allegations regarding Robert Weinstein's participation in Weinstein's commercial sex scheme. It states only, in general terms, that Robert Weinstein facilitated Weinstein's interstate and foreign travel, *see, e.g.*, AC ¶ 444, knew of Weinstein's pattern or practice of assault, *see, e.g.*, *id.* ¶ 449, and was privy to multiple claims of assault alleged against Weinstein, *see, e.g.*, *id.* ¶ 450. These were exactly the allegations found inadequate in *Noble*. The Court has not been given good reason to depart from Judge Sweet's analysis.

The Court accordingly dismisses the AC's TVPA claim against Robert Weinstein.

### 6.    Claims 21 and 22 (RICO): Failure to State a Claim

Finally, Robert Weinstein and the TWC Companies move to dismiss the RICO (claim 21) and RICO conspiracy (claim 22) claims the AC brings against them. R. Weinstein Mem. at 22; TWC Mem. at 16. Canosa does not respond or defend these claims in her opposition brief. There appear to be multiple pleading deficiencies affecting these claims. For present purposes the Court develops only the following two. As explained below, the first requires dismissal of the RICO claims as brought not only against the moving defendants, but against Weinstein and John Does 1-10 as well.[27]

---

[27] The AC does not bring RICO claims against the directors. As to Does 1-10, against whom the RICO claim is brought, the AC does not explain who these persons are. The AC does not describe them among the parties, *see* AC ¶¶ 1-30, nor does it contain a section specifying their

RICO provides a civil remedy to "[a]ny person injured in [her] *business* or *property* by" a RICO violation.  18 U.S.C. § 1964(c) (emphasis added).  "[C]ourts have uniformly held that injuries such as emotional distress or physical injury are not cognizable under RICO."  *Shaw v. Rolex Watch U.S.A., Inc.*, 776 F. Supp. 128, 134 (S.D.N.Y. 1991) (collecting cases); *see also Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 241 (2d Cir. 1999) ("[T]hese RICO causes of action could not be asserted by the smokers . . . because the RICO statute requires an injury to 'business or property,' whereas the smokers' injuries are personal in nature."); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918–19 (3d Cir. 1991) ("The significance of section 1964(c)'s plain language is clear:  RICO plaintiffs may recover damages for harm to business and property only, not physical and emotional injuries due to harmful exposure to toxic waste."); *Grogan v. Platt*, 835 F.2d 844, 846 (11th Cir. 1988) ("The words 'business or property' are, in part, words of limitation; if Congress had intended for the victims of predicate acts to recover for all types of injuries suffered, it would have drafted the statute to read:  'A person *injured* by reason of a violation of a section 1962 of this chapter may sue therefor . . . .'" (citations omitted)).

The AC's RICO claims, however, fail to allege a compensable injury.  The AC alleges that as a result of the described RICO acts, Canosa "sustained injury, emotional pain and suffering, physical pain, emotional distress, pain and suffering and loss of enjoyment of life."  AC ¶ 535.  Although these personal injuries are undeniably consequential, none is an injury to business or property.  *See Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 458

---

conduct, *see id.* ¶¶ 31–168 (describing "ACTIONS OF HARVEY WEINSTEIN," "COMPANY FAILURES AND ACTS," "ROBERT WEINSTEIN'S FAILURES AND ACTS," and the "BOARD OF DIRECTORS' FAILURES AND ACTS.").

(S.D.N.Y. 2004) (describing a compensable injury under RICO as "injury to [a plaintiff's] business or property—and not physical, emotional or reputational harm or any economic aspect of such harm"). The AC separately alleges that Canosa was "injured in [her] person, property and business by reason of these [RICO] violations," AC ¶ 532, but this claim is entirely conclusory. The AC does not allege any facts to support these conclusory allegations. Notably, although the AC at several points alleges that Weinstein threatened to ruin Canosa's career, *see, e.g., id.* ¶¶ 31, 69, 70, 72, it does not anywhere describe any actual harm to her career. Quite the contrary, the AC alleges that Weinstein used his promotion of her career as an opportunity to abuse her. *See id.* ¶ 54 ("Harvey Weinstein advanced plaintiff's career and provided plaintiff with jobs and production opportunities, and plaintiff was working on said jobs producing several film projects with Harvey Weinstein and was assaulted and forcibly sexually assaulted against her will several times under the guise of production work.").

The AC's failure to plead a cognizable injury to business or property requires dismissal of the RICO claims against all defendants.

> *b.* *Predicate Acts*

The AC's RICO claims against Robert Weinstein and Does 1-10 separately fail for failure to adequately plead predicate acts. Section 1961(1) describes a variety of indictable acts that may constitute racketeering activity for purposes of the statute. 18 U.S.C. § 1961(1). The AC alleges three: witness tampering in violation of 18 U.S.C. § 1512, sex trafficking in violation of 18 U.S.C. §§ 1590 and 1591 (the TVPA), and mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. *See* AC ¶ 517.

### i.    Sex Trafficking

For the reasons above, the Court has sustained Canosa's TVPA claims against Weinstein and the TWC Companies, but not as against Robert Weinstein. Accordingly, sex trafficking is a predicate act only as to Weinstein and the TWC Companies.

### ii.    Witness Tampering

The AC adequately alleges that Weinstein made numerous threats against her not to speak to others about his sexual assault of her. *See, e.g., id.* ¶¶ 47 ("Harvey Weinstein again verbally threatened plaintiff not to speak to anyone about his abuse of plaintiff."), 38, 41, 42, 44. Canosa alleges that she did not report the abuse earlier out of fear occasioned by his threats. *See, e.g., id.* ¶¶ 70, 72. However, the AC nowhere alleges that Canosa received "physical force, threats, or persuasion," 18 U.S.C. § 1512, from any other defendants against whom RICO claims are pled, *i.e.*, Robert Weinstein, the TWC Companies, or Does 1-10. Although the AC alleges that "all defendants were aware of, ratified and condoned said threats that were ever received from any other victim," AC ¶ 73, it lacks specific allegations that any non-Weinstein defendant ever affirmatively intimidated her from reporting Weinstein's abuse.

The AC therefore alleges predicate acts of witness tampering only as against Weinstein.

### iii.    Mail and Wire Fraud

As support for the predicate acts of mail and wire fraud, the AC alleges "the transmission, delivery, or shipment of the following by the RICO Defendants or third parties . . ." and then lists a variety of documents. *See* AC ¶ 524. The list of documents contains references to "the Law Firms and Intelligence Participants," "the Complicit Producers," and "Class members." *See id.* The AC does not, in fact, list any such parties. Instead, it cites to "Exhibit 6," *see id.*, which is a class action complaint filed in another case in this District, *Dulany v. Miramax Film NY, LLC*, 18

Civ. 4857 (AKH). These elliptical pleadings in support of claims of mail and wire fraud are manifestly inadequate. The AC does not articulate a coherent theory of fraud. And despite the references above, the AC does not otherwise refer anywhere to law firms, intelligence participants, or complicit producers. Nor, despite the reference to "Class members," does the AC purport to be filed on behalf of a putative class. Simply put, the AC does not allege any facts supporting a claim of mail and wire fraud, let alone by the defendants named in the RICO counts.

The AC has therefore failed to adequately allege predicate acts of mail and wire fraud against any defendant. The only predicate acts it alleges are the acts of sex trafficking by Weinstein and the TWC Companies. The AC's RICO claims as brought against other defendants therefore fail not only because of the absence of a cognizable injury, but also because they fail to allege predicate acts.

## CONCLUSION

For the foregoing reasons, the Court:

1. dismisses all claims against Robert Weinstein;

2. dismisses all claims against the directors;

3. sustains the sex discrimination claims against the TWC Companies brought under the NYSHRL (claim 8), the NYCHRL (claim 9), as well as the TVPA claim (claim 14), and dismisses all other claims against them;

4. sustains the common-law claims against Harvey Weinstein for battery (claim 1), assault (claim 2), IIED (claim 3), sexual assault (claim 6), and false imprisonment (claim 18); sustains the statutory claims against Harvey Weinstein brought under the NYSHRL

(claim 8), the NYCHRL (claim 9), the TVPA (claim 13), and California law (claims 16 and 17); and dismisses all other claims against Weinstein.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 106, 108, 112, 116, and 119, and to terminate Robert Weinstein, Dirk Ziff, Tim Sarnoff, Tarak Ben Ammar, Lance Maerov, Richard Koenigsberg, Jeff Sackman, Paul Tudor Jones, and Does 1-10 as defendants.

Canosa seeks leave to replead again, *see* P. Mem. at 25, although she does not recite any new facts that a new complaint, her third, would add. The Court denies Canosa's present request to replead, for two independent reasons. First, after defendants filed their initial motions to dismiss—substantially on the same grounds pursued here—the Court issued an amend or oppose order notifying Canosa of her right to amend and that no further opportunities to amend thereafter would likely be granted. *See* Dkt. 92. Canosa thereafter filed the AC, on notice that this was her final opportunity to fortify her claims. Second, in seeking—in her opposition brief—leave to replead in the event of dismissals, Canosa has not identified a single additional fact that a new complaint would allege, let alone facts that could close the deficiencies defendants identified. *See* P. Mem. at 25.

The Court, mindful of the complexity and importance of this matter, will permit Canosa to move for *leave* to amend, a final time, the existing complaint. If Canosa wishes to pursue this course and is in possession of facts as-yet unpled that could rehabilitate claims dismissed here, she must submit a proposed amended complaint, and a memorandum of law concretely explaining why the newly pled facts cure the previously identified pleading deficiencies. The Court reminds Canosa's counsel that generalized and conclusory allegations will not suffice. In

the interest of moving this litigation forward to discovery, any such proposed amended complaint and memorandum of law is due two weeks from the date of this decision.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 28, 2019
    New York, New York